IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TIMOTHY J. PAGLIARA,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>Defendant. | C.A. No. 16-193-GMS |

**PLAINTIFF TIMOTHY J. PAGLIARA'S OPENING BRIEF IN SUPPORT OF HIS MOTION TO REMAND TO THE DELAWARE COURT OF CHANCERY**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn (No. 4092)
Adam W. Poff (No. 3990)
Lakshmi A. Muthu (No. 5786)
Gregory J. Brodzik (No. 5722)
Rodney Square
1000 N. King Street
Wilmington, DE 19801-0391
Telephone: (302) 571-6692
*bflinn@ycst.com*
*apoff@ycst.com*
*lmuthu@ycst.com*
*gbrodzik@ycst.com*

*Attorneys for Plaintiff Timothy J. Pagliara*

Dated: August 1, 2016

## TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ..... ii

I. NATURE AND STAGE OF PROCEEDINGS ..... 1

II. SUMMARY OF ARGUMENT ..... 2

III. PRELIMINARY STATEMENT ..... 3

IV. STATEMENT OF FACTS ..... 7

- A. Fannie Mae Background ..... 7
- B. The Conservatorship ..... 8
- C. The Senior Preferred Stock and Treasury's Control ..... 11
- D. Fannie Mae's Investments by Retail Investors and Return to Profitability ..... 13
- E. The Third Amendment and Net Worth Sweep ..... 14
- F. Questions about the Board's Conduct ..... 15
- G. The Common Offering ..... 15
- H. The Demand and the Action ..... 16

V. ARGUMENT ..... 18

VI. CONCLUSION ..... 20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abels v. State Farm Fire & Cas. Co.*,
770 F.2d 26 (3d Cir. 1985)....................2

*Am. Well Works Co. v. Layne & Bowler Co.*,
241 U.S. 257 (1916)....................4, 18

*Boyer v. Snap-on Tools Corp.*,
913 F.2d 108 (3d Cir. 1990)....................18

*Bracken v. Matgouranis*,
296 F.3d 160 (3d Cir. 2002)....................6, 20

*Campbell v. Sussex Cty. Fed. Credit Union*,
No. CIV. 10-710 RBK/AMD, 2011 WL 2532403 (D. Del. June 24, 2011)....................2

*Caterpillar, Inc. v. Williams*,
482 U.S. 386 (1987)....................19

*Cnty. of Sonoma v. Fed. Hous. Fin. Agency*,
710 F.3d 987 (9th Cir. 2013)....................11

*Coardes v. Chrysler Corp.*,
785 F. Supp. 480 (D. Del. 1992)....................2

*Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*,
463 U.S. 1 (1983).................... passim

*Gully v. First Nat'l Bank*,
299 U.S. 109 (1936)....................6, 20

*In re Beach First Nat'l Bancshares, Inc.*,
702 F.3d 772 (4th Cir. 2012)....................10

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.*,
643 F. Supp. 2d 790, 795 (E.D. Va. 2009)....................9

*Jones v. R. R. Donnelley & Sons Co.*,
541 U.S. 369 (2004)....................4, 18

*Kaufman v. Allstate N.J. Ins. Co.*,
561 F.3d 144 (3d Cir. 2009)....................18

*Kellmer v. Raines*,
674 F.3d 848 (D.C. Cir. 2012)....................10

*Leon Cty., Fla. v. Fed. Hous. Fin. Agency*,
700 F.3d 1273 (11th Cir. 2012) ....................................................................................11

*Levin v. Miller*,
763 F.3d 667 (7th Cir. 2014) ........................................................................................10

*Louisiana Mun. Police Emps. Ret. Sys. v. Fed. Hous. Fin. Agency*,
434 F. App'x 188 (4th Cir. 2011) ..................................................................................10

*Louisville & Nashville R.R. Co. v. Mottley*,
211 U.S. 149 (1908)....................................................................................................6, 20

*Lubin v. Skow*,
382 F. App'x 866 (11th Cir. 2010) ................................................................................10

*Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*,
388 F.3d 393 (3d Cir. 2004)...........................................................................................20

*Perry Capital LLC v. Lew*,
70 F. Supp. 3d 208 (D.D.C. 2014)...........................................................................10, 11

*PJM Interconnection, LLC v. City Power Mktg.*,
C.A. No. 12-1779-RGA, 2013 WL 1498656 (D. Del. Apr. 12, 2013) ...................................18

*Rivet v. Regions Bank*,
522 U.S. 470 (1998)........................................................................................................19

*Ry. Labor Execs. Ass'n v. Pittsburgh & Lake Erie R.R. Co.*,
858 F.2d 936 (3d Cir. 1988)............................................................................................19

*St. Joe Co. v. Transocean Offshore Deepwater Drilling, Inc.*,
774 F. Supp. 2d 596 (D. Del. 2011).................................................................................19

*Sullivan v. Elcom Int'l, Inc.*,
2015 WL 881074 (Del. Ch. Jan. 15, 2015)........................................................................6

*United Jersey Banks v. Parell*,
783 F.2d 360 (3d Cir. 1986)..............................................................................................5

*United States v. Aurora Loan Servs., Inc.*,
813 F.3d 1259 (9th Cir. 2016) ...........................................................................................8

**STATUTES**

8 *Del. C.* § 170(a)..............................................................................................................15

12 U.S.C. § 1452(f)(2) ..........................................................................................................2

12 U.S.C. § 1452(f)(3) ..........................................................................................................2

12 U.S.C. § 1716 ....... 2

12 U.S.C. § 1718(c)(1) ....... 15

12 U.S.C. § 1719(g)(1)(A) ....... 11, 12

12 U.S.C. § 1719(g)(1)(C) ....... 13

12 U.S.C. § 4617(b)(2)(A) ....... 8, 9

12 U.S.C. § 4617(b)(2)(D) ....... 9

12 U.S.C. § 4617(b)(2)(K)(i) ....... 10

12 U.S.C. § 4617(f) ....... 11

28 U.S.C. § 1331 ....... 1, 2

28 U.S.C. § 1441(a) ....... 1, 2

28 U.S.C. § 1446 ....... 1

28 U.S.C. § 1447(c) ....... 3, 20

**RULES AND REGULATIONS**

12 C.F.R. § 1710.10(c) ....... 7

## I. NATURE AND STAGE OF PROCEEDINGS

On March 14, 2016, plaintiff Timothy J. Pagliara, a stockholder (the "Stockholder") of defendant Federal National Mortgage Association ("Fannie Mae") filed a Verified Complaint against Fannie Mae in the Delaware Court of Chancery (D.I. 1 Ex. A, the "Complaint" or "Compl."). The Complaint asserts one claim (the "Action"), for inspection of certain books and records of Fannie Mae, under Section 220 of the Delaware General Corporation Law (the "DGCL").

On March 25, Fannie Mae removed the Action to this Court, pursuant to 28 U.S.C. §§ 1331, 1441(a) and 1446, purportedly on the basis of federal question jurisdiction. (D.I. 1.) On March 28, Fannie Mae's conservator, the Federal Housing Finance Agency ("FHFA"), sought to have this Action transferred and consolidated into a proposed multi-district litigation ("MDL"), pursuant to its then pending Motion to Transfer for Coordinated or Consolidated Pretrial Proceedings (the "MDL Motion"), before the Judicial Panel on Multidistrict Litigation (the "Panel"). (D.I. 3.) On April 4, the Court stayed this Action pending a ruling on the MDL Motion by the Panel. (*See* Apr. 4 Minute Entry.) On June 2, the Panel denied the MDL Motion in its entirety, and on July 14 the Court lifted the stay in this Action. (D.I. 6, 7.)

By this Motion to Remand, the Stockholder contends that the Action arises only under state law and the Court therefore lacks federal jurisdiction, with the result that removal was improper. The Stockholder accordingly requests that the Court remand the Action to the Delaware Court of Chancery.[1]

[1] In a separate action in Virginia, the Stockholder is also seeking access to the corporate records of the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Freddie Mac has removed that action to federal court. *See Pagliara v. Fed. Home Loan Mortg. Corp.*, C.A. No. 1:16-CV-337-JCC/JFA (E.D. Va.) (the "Freddie Mac Action"). The Stockholder has not contested the district court's subject matter jurisdiction in the Freddie Mac Action because, by statute, any civil suit to which Freddie Mac is a party is deemed to have federal question

On July 18, FHFA filed with this Court a motion to substitute itself for the Stockholder as Plaintiff (the "Motion to Substitute"). (D.I. 8.) The Court should resolve the threshold jurisdictional issue that this Motion to Remand presents before addressing the Motion to Substitute. *Campbell v. Sussex Cty. Fed. Credit Union*, No. CIV. 10-710 RBK/AMD, 2011 WL 2532403, at *2 (D. Del. June 24, 2011) ("Because the lack of jurisdiction itself precludes the court from asserting judicial power, a court may take no further action in a matter once it determines that it lacks jurisdiction. . . . Thus, jurisdiction is a threshold issue that must be resolved before the court can take any further action in the case."); *see also Coardes v. Chrysler Corp.*, 785 F. Supp. 480, 482 (D. Del. 1992) ("[L]ack of jurisdiction would make any decree in the case void and the continuation of the litigation in federal court futile . . . ." (quoting *Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 29 (3d Cir. 1985)).

## II. SUMMARY OF ARGUMENT

1. The Action should be remanded because it was improperly removed. Under 28 U.S.C. § 1441(a), a defendant may remove to federal court an action brought in state court only if the federal court has "original jurisdiction" over the action. Fannie Mae contends that the Court has federal question jurisdiction over the Action, but this is not so. Under 28 U.S.C. § 1331, the Court has federal question jurisdiction over only "civil actions arising under the Constitution, laws, or treaties of the United States." The Action does not arise under the Constitution, laws, or treaties of the United States. It arises only under Section 220 of the DGCL and therefore arises only under state law.

2. Fannie Mae's purported basis for removing the state law books and records claim from the Court of Chancery – an incorrect federal defense that under the Housing and Economic

---

jurisdiction and may be removed to federal court. *See* 12 U.S.C. 1452(f)(2)-(3). By contrast, there is no similar statute for Fannie Mae. *See* 12 U.S.C. 1716 *et seq.*

Recovery Act of 2008 ("HERA"), FHFA succeeded to the Stockholder's right to bring a books and records claim, and that such a claim would constitute an improper restraint of FHFA's authority as Fannie Mae's conservator – is no basis at all for federal jurisdiction. Contrary to Fannie Mae's argument, under the well-pleaded complaint rule, federal question jurisdiction is not provided by either (a) the assertion of federal defenses by Fannie Mae or (b) allegations in the Complaint that the federal defenses lack merit.

3. Under 28 U.S.C. § 1447(c), if the Action is remanded, the Court should award the Stockholder his "just costs and any actual expenses, including attorney fees, incurred as a result of the removal."

## III. PRELIMINARY STATEMENT

Pursuant to Section 220 of the DGCL, the Stockholder brought this Action in the Delaware Court of Chancery for an order permitting him to inspect and copy certain books and records of Fannie Mae. Fannie Mae was initially federally chartered, but subsequently incorporated in Delaware and expressly elected to follow the DGCL for purposes of corporate governance, except to the extent inconsistent with federal law. The Stockholder seeks the books and records primarily for three purposes: (1) to investigate misconduct by the board of directors of Fannie Mae (the "Board"); (2) to communicate with other stockholders about the misconduct and (3) to value his investment in Fannie Mae.[2]

As for the first purpose, the Stockholder seeks to investigate the Board's actions and omissions in a blatantly unfair transaction between Fannie Mae and its controlling stockholder,

---

2 Although other cases concerning the Third Amendment and the Net Worth Sweep are pending, including one in this Court, *Jacobs v. Federal Housing Finance Agency*, C.A. No. 15-708-GMS, they address primarily violations of federal law and are focused on wrongdoing of persons other than the Board.

the United States Department of the Treasury ("Treasury"). By the transaction, Fannie Mae and Treasury agreed to amend the terms of Fannie Mae's senior preferred stock held by Treasury (the "Senior Preferred Stock"). In the amendment (the "Third Amendment"), Fannie Mae agreed, for no return consideration whatsoever, to increase the dividends on the Senior Preferred Stock from 10% in cash (or 12% in kind) of the liquidation preference annually to *the entire net worth of Fannie Mae in perpetuity* (the "Net Worth Sweep"). The Third Amendment and Net Worth Sweep severely damaged the value of the stock held by all of Fannie Mae's stockholders other than Treasury.

The Stockholder also seeks to investigate the Board's actions and omissions in Fannie Mae's ongoing quarterly payment of dividends to Treasury pursuant to the Net Worth Sweep.

Finally, the Stockholder seeks to investigate the Board's actions and omissions in Fannie Mae's investment of tens of millions of dollars in a common mortgage security offering to be shared with Fannie Mae's competitors (the "Common Offering").[3] The Common Offering is designed to harm Fannie Mae, by eliminating its market advantage over its competitors.

The Stockholder seeks to confirm that, in the above transactions, the Board breached multiple fiduciary, contractual and statutory duties under Delaware law, including the fiduciary duty of loyalty and Sections 242(b)(2), 151 and 170 of the DGCL. There is no basis for this Court to exercise federal question jurisdiction over the Action because the Action does not arise under federal law; it arises only under Delaware law. As the United States Supreme Court has repeatedly explained, "A suit arises under the law that creates the cause of action." *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 8-9 (1983) (quoting *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916)); *accord Jones v. R. R. Donnelley & Sons Co.*,

[3] The Common Offering is comprised of Common Securitization Solutions, LLC, the Common Securitization Platform and the Single Security, all as defined in the Complaint.

541 U.S. 369, 377 (2004). Here, where the Action was created by Section 220 of the DGCL, it arises under Delaware law.

To prevail on his claims under Section 220, the Stockholder must establish only matters governed by Delaware law. *First*, he must establish that his pre-litigation demand for books and records from Fannie Mae (the "Demand") satisfied Section 220's requirements concerning the form and manner of making the request for books and records. *Second*, he must establish that his purposes for seeking inspection of books and records are proper under Delaware law. *Finally*, as required by Delaware law to substantiate the investigatory purpose, he must establish credible bases for believing that the Board engaged in misconduct. No element of the Action is governed by federal law.

Fannie Mae contends that federal question jurisdiction arises from Fannie Mae's own incorrect assertion that the Action is barred by federal law. (D.1. 1 at 2-5). Even if the Action might be barred by federal law (and it is not), such federal law would not provide a basis for federal question jurisdiction. The Supreme Court has repeatedly held, for federal question jurisdiction, that "a suit brought upon a state statute does not arise under an act of [the United States] Congress or the Constitution of the United States [simply] because [it may be] prohibited thereby." *Franchise Tax*, 463 U.S. at 12; *accord United Jersey Banks v. Parell*, 783 F.2d 360, 366 (3d Cir. 1986).

Also contrary to Fannie Mae's assertion (D.I. 1 at 4-5), federal question jurisdiction is not provided by the Complaint's allegations that the asserted federal defenses lack merit. The Supreme Court has explained that a "federal court does not have original jurisdiction over a case in which the complaint presents a state-law cause of action but also asserts that . . . a federal defense the defendant may raise is not sufficient to defeat the claim." *Franchise Tax*, 463 U.S. at

10 (citations omitted).[4] Fannie Mae has no colorable argument that the Court may exercise federal question jurisdiction. The Action should be remanded to the Delaware Court of Chancery.

The Stockholder is an individual stockholder of Fannie Mae. He is among other individual stockholders of Fannie Mae, who include high school principals, judges, doctors, clergy, accountants, retirees and other retail investors. Their savings that were invested in Fannie Mae have been wiped out by the Third Amendment and the Net Worth Sweep. They have been waiting for years in vain for Fannie Mae to disclose the details of its Board's involvement in the transactions described herein. Having given up waiting, the Stockholder has now taken it upon himself to obtain the information by means of this books and records Action.

Section 220 provides for a summary proceeding in the Court of Chancery. As the Court of Chancery has frequently explained, such actions are summary by statute and therefore should be resolved promptly, generally within 45 to 60 days. *See Sullivan v. Elcom Int'l, Inc.*, 2015 WL 881074, at 13 (Del. Ch. Jan. 15, 2015) (TRANSCRIPT) ("Generally speaking . . . we handle 220 cases on a summary basis. We do aim to have trials of those kind of cases within 60 days."). By its improper removal, Fannie Mae has already interfered with the Stockholder's right to a summary proceeding. The Stockholder therefore respectfully requests that the Court address this Motion to Remand as soon as reasonably practicable.

---

4 *See also Gully v. First Nat'l Bank*, 299 U.S. 109, 113 (1936) (A complaint will not create federal jurisdiction by "go[ing] beyond a statement of the plaintiff's cause of action and anticipat[ing] or repl[ying] to a probable defense"); *cf. Bracken v. Matgouranis*, 296 F.3d 160, 163 (3d Cir. 2002) (The court does not have federal jurisdiction where plaintiff merely "alleges some anticipated defense to his cause of action and asserts that the defense is invalidated by some provision of the Constitution of the United States." (quoting *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908))).

## IV. STATEMENT OF FACTS

### A. Fannie Mae Background

In 1938, Fannie Mae's predecessor was created by federal statute as a government entity. (Compl. ¶ 26.) In 1954, the United States Congress ("Congress") began the process of privatizing Fannie Mae, through the Federal National Mortgage Association Charter Act (the "Charter Act"). (*Id.* ¶ 28.) By 1970, Fannie Mae's privatization had been completed. (*Id.* ¶ 36.) Since then, Fannie Mae has been a private corporation, with private stockholders, with its stock publicly traded, first on the New York Stock Exchange and later over the counter, through the OTC Bulletin Board. (*Id.* ¶¶ 2, 36, 103.) Like other private financial institutions, Fannie Mae has been regulated by federal agencies.

In 2002, Fannie Mae's then-regulator, the Office of Federal Housing Enterprise Oversight, directed Fannie Mae to choose, within 90 days from August 5, 2002, to be governed by one of three alternative bodies of corporation law, one of which was the DGCL. 12 C.F.R. § 1710.10(c) (2002). Promptly thereafter, on August 21, 2002, Fannie Mae filed a certificate of incorporation in Delaware. (Compl. Ex. C.) Fannie Mae's bylaws as of January 21, 2003 state, "The inclusion of provisions in these Bylaws shall constitute inclusion in the corporation's 'certificate of incorporation' for all purposes of the Delaware General Corporation Law." (Fannie Mae Bylaws (am. through Jan. 21, 2003) § 1.05 (Ex. A).)[5]

The Bylaws further state that Fannie Mae "elected to follow the applicable corporate governance practices and procedures of the Delaware General Corporation Law, as the same may be amended from time to time" to the extent not inconsistent with federal law. *Id.* Since 2002,

---

[5] Unless otherwise indicated, the Exhibits referenced herein shall be the Exhibits attached to the Declaration of Adam W. Poff in Support of Plaintiff Timothy J. Pagliara's Motion to Remand to the Delaware Court of Chancery, submitted herewith.

Fannie Mae therefore has been governed by the DGCL, including Section 220 of the DGCL, except to the extent inconsistent with federal law. In March 2003, Fannie Mae voluntarily registered its common stock and began filing financial reports with the U.S. Securities and Exchange Commission. (Compl. ¶ 37.)

**B. The Conservatorship**

On September 7, 2008, at the height of the 2007-09 financial crisis, Fannie Mae's new regulator, FHFA, placed Fannie Mae into temporary conservatorship (the "Conservatorship"). (Compl. ¶ 65.) FHFA did so ostensibly under the authority of Housing and Economic Recovery Act of 2008 ("HERA").

Contrary to Fannie Mae's suggestion (D.I. 1 at 2-4), under HERA, FHFA is not all-powerful as conservator. HERA specified the extent of FHFA's powers as conservator. Under HERA, FHFA as conservator succeeded to "all rights, titles, powers, and privileges of [Fannie Mae], and of any stockholder, officer, or director of [Fannie Mae] with respect to [Fannie Mae] and the assets of [Fannie Mae]." 12 U.S.C. § 4617(b)(2)(A)(i). FHFA's powers therefore are limited to the pre-existing powers of Fannie Mae and its stockholders, Board and management, with respect to Fannie Mae and its assets. As the United States Court of Appeals for the Ninth Circuit recently explained,

> We agree that the FHFA has "all the rights, titles, powers and privileges of" [Fannie Mae] . . . . However, this places FHFA in the shoes of Fannie Mae [ ] and gives FHFA [its] rights and duties, not the other way around.

*United States v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1261 (9th Cir. 2016).

As FHFA merely stands in the shoes of Fannie Mae and its stockholders, Board and management, its powers are no greater than the powers possessed by the latter. As the powers of the latter are constrained by Delaware law, so too are FHFA's powers. Although the powers are

undoubtedly sufficient for FHFA to carry out its mandate under HERA to "conserve and preserve" Fannie Mae's assets, since it is constrained by Delaware law, FHFA cannot direct Fannie Mae to violate Delaware law.[6]

On November 24, 2008, FHFA reconstituted Fannie Mae's Board and re-delegated to the Board the board powers to which FHFA had succeeded when the Conservatorship took effect, including the powers to "review and approve matters related to . . . paying dividends . . . ." (Fannie Mae Corporate Governance Guidelines, at 1 (Nov. 13, 2015) (Ex. B).) Since then, Fannie Mae has maintained that its Board functions "in accordance with [its] designated duties and with the authorities as set forth in . . . Delaware law (insofar as the company has adopted its provision for corporate governance purposes)[.]" (Fannie Mae, Annual Report (Form 10-K), at 161 (Feb. 19, 2016) (Ex. C (excerpt)).)

Contrary to Fannie Mae's argument for removal (D.I. 1 at 2, 4), FHFA did not succeed to the Stockholder's rights under Section 220 of the DGCL, thereby divesting the Stockholder of such rights. As quoted above, FHFA succeeded to only the rights of stockholders "with respect to [Fannie Mae] and the assets of [Fannie Mae]." *See* 12 U.S.C. § 4617(b)(2)(A)(i). The courts have uniformly interpreted this provision and the substantially identical provision in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA")[7] as giving

[6] HERA further constrains FHFA's exercise of power by requiring that FHFA's use of the powers of Fannie Mae and its stockholders, Board and management to fulfill certain statutory purposes. For example, FHFA as conservator may "take such action as may be . . . necessary to put [Fannie Mae] in a sound and solvent condition" or "appropriate to carry on the business of [Fannie Mae] *and* preserve and conserve the assets and property of [Fannie Mae]." 12 U.S.C. § 4617(b)(2)(D) (emphasis added).

[7] When interpreting HERA's succession provision under 12 U.S.C. § 4617(b)(2)(A), courts have consistently found persuasive authorities interpreting FIRREA's nearly-identical succession provision. *See, e.g., In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 795 (E.D. Va. 2009) ("Additionally, the Court is persuaded by decisions that have reached the same conclusion when interpreting [FIRREA], whose provisions regarding the

FHFA and the Federal Deposit Insurance Corporation ("FDIC") only the rights of stockholders to assert *derivative* claims *on behalf of* the regulated entity. They have interpreted the provisions as leaving intact the *direct* rights of stockholders *against* the regulated entity. *See Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208, 230 (D.D.C. 2014) (HERA's "language plainly transfers shareholders' ability to bring *derivative* suits—a 'right[ ], title[ ], power[ ], [or] privilege[ ]'—to FHFA." (emphasis added) (quoting *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012)); *Levin v. Miller*, 763 F.3d 667, 672 (7th Cir. 2014) (finding that FIRREA "transfers to the FDIC only stockholders' claims 'with respect to . . . the assets of the institution'—in other words, those that investors . . . would pursue derivatively on behalf of the failed bank[,]" and noting that "[n]o federal court has read [FIRREA otherwise]").[8] In the Action, the Stockholder asserts only direct rights against the corporation.[9]

Under HERA, direct stockholder rights are extinguished only upon the initiation of a receivership. 12 U.S.C. § 4617(b)(2)(K)(i) ("[T]he appointment of the Agency as *receiver* for a regulated entity . . . shall terminate all rights and claims that the stockholders and creditors of the regulated entity may have against the assets or charter of the regulated entity or the Agency

---

powers of federal bank receivers and conservators are substantially identical to those of HERA."), *aff'd sub nom. Louisiana Mun. Police Emps. Ret. Sys. v. Fed. Hous. Fin. Agency*, 434 F. App'x 188 (4th Cir. 2011); *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012) (analyzing HERA by relying on cases examining FIRREA, which "contains virtually identical language").

8 *See also In re Beach First Nat'l Bancshares, Inc.*, 702 F.3d 772, 776, 780 (4th Cir. 2012) (affirming dismissal of "*derivative claims* [that] had been divested by statute in favor of the FDIC" under FIRREA, but allowing Trustee to proceed with a direct claim (emphasis added)) ; *Lubin v. Skow*, 382 F. App'x 866, 870 (11th Cir. 2010) ("FIRREA grants the FDIC ownership over all shareholder derivative claims against the Bank's officers. . . . The question then becomes whether the claims against the Bank's officers are derivative claims.").

9 It makes perfect sense that HERA's succession provision applies only to derivative claims. As conservator, FHFA has the right and authority to operate Fannie Mae. FHFA therefore needs the rights of stockholders to make decisions for the corporation and to assert derivative claims on the corporation's behalf. However, to operate Fannie Mae, FHFA does not need the rights of stockholders against the corporation.

. . . .") (emphasis added). As FHFA has placed Fannie Mae into only conservatorship, stockholders retain their direct rights.[10]

**C. The Senior Preferred Stock and Treasury's Control**

On the same day that the Conservatorship was imposed, also under authority provided by HERA, Treasury entered into a Preferred Stock Purchase Agreement (the "PSPA") with Fannie Mae and invested in the Senior Preferred Stock of Fannie Mae. (PSPA (Sept. 7, 2008) (Ex. D).) HERA required that any such investment by Treasury must be on terms agreeable to Fannie Mae: "Nothing in this subsection requires [Fannie Mae] to issue obligations or securities to the Secretary [of Treasury] without mutual agreement between the Secretary and [Fannie Mae]." 12 U.S.C. § 1719(g)(1)(A). The Senior Preferred Stock entitled Treasury to receive a cumulative cash dividend of 10% per annum of the Senior Preferred Stock's liquidation preference or, if the dividends were paid in kind, 12% per annum, until all cumulated dividends were paid in cash. (Certificate of Designation § 2(c) (Sept. 7, 2008) (Ex. E).)

---

[10] Contrary to Fannie Mae's argument (D.I. 1 at 2-4), during the Conservatorship, neither Fannie Mae nor FHFA are beyond judicial scrutiny. The HERA provision cited by Fannie Mae, Section 4617(f), certainly presents no bar to the Stockholder's Action seeking to inspect books and records of Fannie Mae. If it is determined that Stockholder is entitled to inspection, FHFA's decision to the contrary will have violated Delaware law and thereby exceeded FHFA's powers. The courts have uniformly held that Section 4617(f) does not prevent a court from restraining or affecting actions by FHFA that exceed its powers. *Cnty. of Sonoma v. Fed. Hous. Fin. Agency*, 710 F.3d 987, 992 (9th Cir. 2013) ("[T]he anti-judicial review provision is inapplicable when FHFA acts beyond the scope of its conservator power."); *Leon Cty., Fla. v. Fed. Hous. Fin. Agency*, 700 F.3d 1273, 1278 (11th Cir. 2012) ("[I]f the FHFA were to act beyond statutory or constitutional bounds in a manner that adversely impacted the rights of others, § 4617(f) would not bar judicial oversight or review of its actions.") (citation omitted); *Perry Capital LLC*, 70 F. Supp. 3d at 220 ("Like a number of its sister circuits, . . . this Circuit has established that, if the agency has acted or proposes to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions, then 12 U.S.C. § 4617(f) shall not apply.") (internal quotations marks omitted).

Also, under the PSPA, Fannie Mae issued Treasury a warrant to purchase 79.9% of Fannie Mae's common stock for nominal consideration. (PSPA §§ 1, 3.1 (Ex. D).) The PSPA further gave Treasury the right to veto an extensive list of corporate actions. (*Id.* § 5.)

As the Congressional Budget Office informed Congress in 2011, the "federal conservatorship of Fannie Mae . . . result[ed in] ownership and control [of Fannie Mae] by the Treasury . . . ." (Statement of Deborah Lucas, at 2 (June 2, 2011) (Ex. F (excerpt)); *see also* Henry M. Paulson, Jr., *On the Brink* xiv, xli (2013) (Ex. G (excerpt)) (As former Treasury Secretary Paulson has explained, "[One] of the actions I took" was "seizing control of the quasi-governmental mortgage giants, Fannie Mae and Freddie Mac [a/k/a Federal Home Loan Mortgage Corporation][.]" Former Representative Barney Frank said of the former Treasury Secretary, "he exercised th[e] conservatorship powers.").)

Over time, Fannie Mae drew $116.1 billion from Treasury under the PSPA. (Fannie Mae, Quarterly Report (Form 10-Q), at 2 (May 5, 2016) (Ex. H (excerpt)).) As detailed in the Complaint, Fannie Mae did not need these funds to meet its obligations. (Compl. ¶¶ 65-70.) Rather, Treasury used Fannie Mae, during the 2007-09 financial crisis to support mortgage markets. (*Id.*; *see also* Mark Jickling, *CRS Report for Congress*, at 5 (Sept. 15, 2008) (Ex. I) ("By intervening and in effect stating that it will bear any further losses to the GSEs . . . , the Treasury hopes to reduce . . . uncertainty and create conditions under which markets can return to normal.").) During the financial crisis, Fannie Mae *increased* the size of its mortgage portfolio, by investing in "mostly subprime, Alt-A and non-performing prime mortgage securities." (*See* Dawn Kopecki, *Fannie, Freddie to Buy $40 Billion a Month of Troubled Assets*, Bloomberg News (Oct. 11, 2008) (Ex. J).) Upon information and belief, the entirety of

the funds drawn from Treasury was used by Fannie Mae to provide liquidity to mortgage markets. (*See* Compl. ¶¶ 65-70.)

The Conservatorship was to be temporary. (Compl. ¶¶ 71-74.) In exercising its investment authority under HERA, Treasury was required to consider the "need to maintain [Fannie Mae's] status as a private shareholder-owned company" and to "plan for the orderly resumption of private market funding or capital market access." 12 U.S.C. § 1719(g)(1)(C). As the acting Director of FHFA explained, the only "post-conservatorship outcome[] . . . that FHFA may implement today under existing law is to reconstitute [Fannie Mae] under [its] current charter." (Compl. ¶ 72 & n.27.) FHFA's Director assured Congress that Fannie Mae's "shareholders are still in place[,] . . . common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest. (Compl. ¶ 74 & n.29.)

### D. Fannie Mae's Investments by Retail Investors and Return to Profitability

When federal officials were providing their assurances that Fannie Mae would remain a private corporation, for the benefit of its private stockholders, the Stockholder purchased his stock of Fannie Mae. During this same time, other individuals invested in stock of Fannie Mae, including the previously described retail investors. Based upon their reasonable and ultimately correct estimation that Fannie Mae's income would improve as mortgage markets rebounded, they expected their investments to have substantial value.

Years later, by mid-2012, Fannie Mae had indeed become highly profitable and stood on the verge of enormous net worth. As detailed in the Complaint, Fannie Mae (1) reported net income of $5.1 billion for the second quarter of 2012, (2) expected to reverse its prior write-off of deferred tax assets that would produce more than $50 billion in net worth for Fannie Mae in the first quarter of 2013, (3) also expected to reverse its prior increase in provisions for credit

losses that would produce more than an additional $40 billion in net worth for Fannie Mae during the few years immediately to follow and (4) foresaw lucrative settlements with numerous financial institutions that would produce more than $18 billion in net worth for Fannie Mae in 2013 and early 2014. (Compl. ¶¶ 104-111.)

However, at this same time, as Congress could not agree to increase the federal debt ceiling, Treasury faced a looming budgetary crisis.

**E. The Third Amendment and Net Worth Sweep**

On August 17, 2012, Fannie Mae and Treasury – then Fannie Mae's controlling stockholder – entered into a blatantly unfair, self-dealing transaction. By the Third Amendment to the PSPA, Fannie Mae and Treasury agreed to increase the dividend on the Senior Preferred Stock from 10% in cash (12% if paid in kind) to the *entirety of Fannie Mae's future net worth in perpetuity*. (*See* Compl. Ex. D § 3 (Third Amendment).) For zero return consideration, Fannie Mae gave up its entire net worth to its controlling stockholder. (Compl. ¶ 123.)

Fannie Mae has paid the Net Worth Sweep dividends for every quarter since the Third Amendment took effect. (Compl. ¶ 141.) After the reversal in early 2013 of about $50 billion of the prior write-off of deferred tax assets, Fannie Mae paid Treasury a dividend of $59.4 billion for only the second quarter of 2013 (as compared to a pre-existing dividend of $2.9 billion per quarter at the 10% rate). (Compl. ¶ 124.) Since the Third Amendment, the total increase in dividends has been $78.2 billion, and this figure is growing with every quarter. (*See id.*; Fannie Mae, Quarterly Report, at 36 (Form 10-Q) (May 5, 2016) (Ex. H (excerpt)).) The Third Amendment was wholly inconsistent with FHFA's statutory directive to "preserve and conserve" Fannie Mae's assets. The Net Worth Sweep can be explained only by Treasury's need for revenue and control of Fannie Mae.

### F. Questions about the Board's Conduct

It is not known whether the Board of Fannie Mae approved the Third Amendment or merely was supine in response to Treasury's looting of Fannie Mae's assets. The Stockholder seeks this information by means of the Action. Both before and after the Third Amendment, the Board might have opposed the Third Amendment, but it apparently did not do so privately and did not do so publicly. The Board also might have sought court action to prevent or reverse the Third Amendment, but it has not done so. The Board also might have, but did not take any other action to protect Fannie Mae from the harm of the Net Worth Sweep, such as by fully refinancing and redeeming the Senior Preferred Stock, thereby eliminating the Net Worth Sweep. (*See* Compl. ¶ 130, 136, 139.) It is not known why the Board omitted taking such action to protect Fannie Mae. The Stockholder seeks this information by means of the Action.

It also is not known whether the Board has been approving the dividends paid under the Net Worth Sweep. (*See* Compl. ¶ 200.) Under the DGCL, the Charter Act and even the Third Amendment, there was no requirement that Fannie Mae actually pay the dividends under the Net Worth Sweep. (*See* 12 U.S.C. § 1718(c)(1) (2008); 8 *Del. C.* § 170(a); Compl. Ex. D.) All three leave that decision in the Board's discretion. (*See id.*) Also, as explained above, FHFA had established that the Board would be responsible for approving the payment of dividends. Even if the Board did not approve the dividends, it was apparently supine in the face of Treasury's demand that they be paid. (*See* Compl. ¶ 139.) The requested books and records should shed light on the Board's conduct.

### G. The Common Offering

Since 2012, Fannie Mae also has been investing tens of millions of dollars to remake the mortgage market in a manner that is not expected to benefit Fannie Mae, but to harm it. (Compl. ¶¶ 147, 151, 153-54.) Fannie Mae has invested more than $40 million in the Common Offering,

which is intended to replace Fannie Mae's and Freddie Mac's separate, proprietary systems for securitizing mortgages and related back office and administrative functions with a common system available to all market participants. (*See id.* ¶¶ 148, 151-52.) The Common Offering includes the development of a single mortgage-backed security to be issued by all market participants. (*Id.* ¶ 152.) As Fannie Mae's mortgage-backed securities trade at a premium to other market participants, the movement to a single security would eliminate a substantial market advantage for Fannie Mae. (*Id.* ¶ 153 & n.56, n.57.) As a private corporation, Fannie Mae had no obligation to fund such government initiatives, much less to its own detriment. It is not known at this time whether the Board has approved these investments or whether it has simply been supine in the face of them. The Stockholder seeks this information by means of the Action.

### H. The Demand and the Action

On January 19, 2016, pursuant to Section 220 of the DGCL, counsel for the Stockholder served the Demand on Fannie Mae. (Compl. Ex. A.) The Demand sought information primarily concerning the Board's actions and omissions in the Third Amendment, Net Worth Sweep dividends and Common Offering. (*Id.*) Contrary to Fannie Mae's suggestion (D.I. 1 at 3), compliance with the Demand would not be burdensome. The Demand seeks to inspect primarily "Board Materials" (documents prepared by or exchanged with the Board) and any directives by Treasury or FHFA to Fannie Mae, both only to the extent that they concern one or more of the three areas of inquiry. (*Id.* at 2-3.) On January 27, 2016, Fannie Mae, through FHFA, rejected the Demand. (Compl. Ex. H, G.)

Due to Fannie Mae's rejection of the Demand, Section 220 of the DGCL entitled the Stockholder to commence a summary proceeding in the Delaware Court of Chancery for the inspection of books and records of Fannie Mae. Section 220 provides, "If the corporation . . . refuses to permit an inspection sought by a stockholder . . . pursuant to subsection (b) of this

section . . . , the stockholder may apply to the Court of Chancery for an order to compel such inspection. . . . The Court may summarily order the corporation to permit the stockholder to inspect the corporation's . . . books and records and to make copies or extracts therefrom[.]" 8 *Del. C.* § 220.

The Stockholder therefore commenced the Action in the Delaware Court of Chancery, filing his Complaint on March 14, 2016. The only claim asserted by the Complaint is a claim for inspection of books and records under Section 220. After a "Background" section, a portion of the Complaint explained why the Demand complied with Section 220's formal requirements, concerning the form and manner of making the request for books and records. (Compl. ¶¶ 156-63.) The next portion of the Complaint then explained why each of the Stockholder's three purposes for seeking inspection is proper under Delaware law. (Compl. ¶¶ 164-66.) As was required under Delaware law to substantiate the investigatory purpose, the next portion of the Complaint then detailed the Stockholder's credible bases for believing that the Board had engaged in misconduct. (Compl. ¶¶ 167-206.)

As the Complaint shows, all the Stockholder's credible bases for believing that the Board engaged in misconduct concern only Delaware law. All the bases concern the Board's possible violations of statutory, contractual and fiduciary duties under Delaware law.[11]

---

[11] It is alleged that, in approving, permitting or not opposing the Third Amendment and Net Worth Sweep, to benefit Fannie Mae's controlling stockholder, the Board appears to have breached fiduciary duties under Delaware law, including the fiduciary duty of loyalty. (Compl. ¶¶ 9, 188-93.) It is specifically alleged that the Board violated its fiduciary duty under Delaware law to protect the corporation from harm. (*See* Compl. ¶¶ 168, 194-95.) It is alleged that, in approving, permitting or not opposing the Third Amendment, the Board violated Section 242(b)(2) of the DGCL, Section 7(c) of the certificates of designation for Fannie Mae's junior preferred stock, which are governed by Delaware law, and Section 151 of the DGCL. (Compl. ¶¶ 10, 175-83.) It is alleged that in approving, permitting or not opposing the dividends paid under the Net Worth Sweep, the Board violated Section 170 of the DGCL. (Compl. ¶¶ 197-200.) Finally, it is alleged that in approving, permitting or not opposing Fannie Mae's investment in

The Complaint, like this brief, addresses matters of federal law only as background, in anticipation of the incorrect defenses that Fannie Mae has now raised.

## V. ARGUMENT

The Action should be remanded because Fannie Mae's removal of the Action was improper. "A defendant may remove to federal court 'any civil action brought in a state court of which the district courts of the United States have original jurisdiction.'" *PJM Interconnection, LLC v. City Power Mktg.*, C.A. No. 12-1779-RGA, 2013 WL 1498656, at *1 (D. Del. Apr. 12, 2013) (quoting 28 U.S.C. § 1441(a)). "The party seeking removal bears the burden of showing that federal jurisdiction exists." *Id.* (citing *Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 151 (3d Cir. 2009)). "Due to federalism concerns, the 'removal statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand.'" *Id.* (quoting *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990)).

Contrary to Fannie Mae's assertion, this Court does not have federal question jurisdiction over the Action. Federal question jurisdiction "only exists if the cause of action is one 'arising under the Constitution, laws, or treaties of the United States.'" *Id. at* *3 (quoting 28 U.S.C. § 1331). The Action does not arise under the Constitution, laws or treaties of the United States. As the United States Supreme Court has repeatedly explained, "A suit arises under the law that creates the cause of action." *Franchise Tax*, 463 U.S. at 8-9 (quoting *Layne & Bowler Co.*, 241 U.S. at 260); *accord R. R. Donnelley & Sons Co.*, 541 U.S. at 377. Here, the law that created the Stockholder's cause of action is Section 220 of the DGCL. The Action therefore arises only under Delaware law.

---

the Common Offering, the Board further violated its fiduciary duties under Delaware law, including the duty of good faith, and committed corporate waste under Delaware law. (*See* Compl. ¶¶ 188, 201, 204-06.)

There is no merit to Fannie Mae's contention that federal question jurisdiction exists based upon federal defenses to be asserted by Fannie Mae. Even if the federal defenses established that the Action was barred by federal law (and they do not), under the well-pleaded complaint rule, they would not provide a basis for federal jurisdiction. As the Supreme Court explained, in *Franchise Tax Board of California v. Construction Laborers Vacation Trust for Southern California*, "By unimpeachable authority, a suit brought upon a state statute does not arise under an act of Congress or the Constitution of the United States *because prohibited thereby*." 463 U.S. at 12 (emphasis added). The Supreme Court further explained in the same case that "since 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption . . . ."[12] *Id.* at 14; *accord Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987). Indeed, as the Third Circuit has observed, "State courts are competent to determine whether state law has been preempted by federal law and they must be permitted to perform that function in cases brought before them, absent a Congressional intent to the contrary."[13] *Ry. Labor Execs. Ass'n v. Pittsburgh & Lake Erie R.R. Co.*, 858 F.2d 936, 942 (3d Cir. 1988).

There also is no merit to Fannie Mae's contention that federal jurisdiction exists because the Complaint alleges that some of Fannie Mae's asserted federal defenses are wrong. Applying the well-pleaded complaint rule, the Supreme Court and other federal courts have determined that "a federal court does not have original jurisdiction over a case in which the complaint

---

[12] According to the Supreme Court, this is true "even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Franchise Tax*, 463 U.S at 14; *accord Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998).

[13] *See also St. Joe Co. v. Transocean Offshore Deepwater Drilling, Inc.*, 774 F. Supp. 2d 596, 603 (D. Del. 2011) ("No federal question is created by asserting that the state law on which a complaint is based has been preempted by federal law, i.e., a federal preemption defense.").

presents a state-law cause of action, but also asserts . . . that a federal defense the defendant may raise is not sufficient to defeat the claim." *Franchise Tax*, 463 U.S. at 10; *see also Gully v. First Nat'l Bank*, 299 U.S. 109, 113 (1936) (A complaint will not create federal jurisdiction by "go[ing] beyond a statement of the plaintiff's cause of action and anticipat[ing] or repl[ying] to a probable defense"); *cf. Bracken v. Matgouranis*, 296 F.3d 160, 163 (3d Cir. 2002) (The court does not have federal jurisdiction where plaintiff merely "alleges some anticipated defense to his cause of action and asserts that the defense is invalidated by some provision of the Constitution of the United States") (quoting *Mottley*, 211 U.S. at 152).

The Supreme Court further explained that a "right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action." *Franchise Tax*, 463 U.S. at 10-11; *accord Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 398 (3d Cir. 2004). Here, no federal law is an element of the Stockholder's claim, much less an essential one. All elements of the claim are set forth in Section 220; all elements of the Stockholder's claim are state-law elements. There is no federal question jurisdiction.

As there was no colorable basis for removal, pursuant to 28 U.S.C. § 1447(c), the Court should award the Stockholder his "just costs and any actual expenses, including attorney fees, incurred as a result of the removal."

## VI. CONCLUSION

Because the Stockholder's single claim for relief arises under Delaware law, and not federal law, this Action should be promptly remanded to the Delaware Court of Chancery in accordance with 28 U.S.C. § 1447(c) so that the Action can proceed in that court. The Stockholder should be awarded his costs and expenses incurred as the result of the improper removal.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Adam. W. Poff*

C. Barr Flinn (No. 4092)
Adam W. Poff (No. 3990)
Lakshmi A. Muthu (No. 5786)
Gregory J. Brodzik (No. 5722)
Rodney Square
1000 N. King Street
Wilmington, DE 19801-0391
Telephone: (302) 571-6692
*bflinn@ycst.com*
*apoff@ycst.com*
*lmuthu@ycst.com*
*gbrodzik@ycst.com*

*Attorneys for Plaintiff Timothy J. Pagliara*

DATED: August 1, 2016

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on August 1, 2016, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

S. Mark Hurd, Esquire
Zi-Xiang Shen, Esquire
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
*shurd@mnat.com*
*zshen@mnat.com*

*Attorneys for Defendant Federal National Mortgage Association*

Robert J. Stearn, Jr., Esquire
Robert C. Maddox, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
*stearn@rlf.com*
*maddox@rlf.com*

*Attorneys for Federal Housing Finance Agency*

I further certify that on August 1, 2016, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel of record and on the following:

Jeffrey W. Kilduff, Esquire
Michael Walsh, Esquire
O'Melveny & Myers LLP
1626 Eye Street, N.W.
Washington, DC 20006-4001
*jkilduff@omm.com*
*mwalsh@omm.com*

*Attorneys for Defendant Federal National Mortgage Association*

Howard N. Cayne, Esquire
Asim Varma, Esquire
David Bergman, esquire
Arnold & Porter LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
*howard.cayne@aproter.com*
*asim.varma@aporter.com*
*david.bergman@aporter.com*

*Attorneys for Federal Housing Finance Agency*

Dated: August 1, 2016

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Adam W. Poff*
C. Barr Flinn (No. 4092)
Adam W. Poff (No. 3990)
Lakshmi A. Muthu (No. 5786)
Gregory J. Brodzik (No. 5722)
Rodney Square
1000 North King Street
Wilmington, DE 19801-0391
(302) 571-6692
*bflinn@ycst.com*
*apoff@ycst.com*
*lmuthu@ycst.com*
*gbrodzik@ycst.com*

*Attorneys for Plaintiff*
*Timothy J. Pagliara*